1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PABLO SALAS, | Case No. 1:15-cv-00831-LJO-EPG-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| M.D. BITER, | |
| Respondent. | |

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition for writ of habeas corpus, Petitioner Pablo Salas raises three claims for relief: (1) that there was insufficient evidence to support the gang-murder special circumstance and the appellate court erroneously declined to rule on this issue because a reversal would not change his sentence; (2) that after ruling that the defense failed to make a *prima facie* case of racial discrimination in the prosecution's exercise of peremptory challenges of certain jurors, the trial court invited the prosecutor to comment on the reasons for striking said jurors and improperly granted the request to file the reasons under seal; and (3) that the trial court erroneously denied Petitioner's motion to sever his trial.

Respondent argues that Petitioner's first claim for relief is not cognizable because Petitioner is not challenging his custodial sentence. Respondent contends that all of Petitioner's claims must be denied because Petitioner has not shown that the state court decision was

1    contrary to or an unreasonable application of Supreme Court precedent.

2        For the reasons discussed below, the Court recommends dismissing Petitioner's first

3    claim for relief and denying the petition.

4    **I.**

5    **BACKGROUND**

6        On June 1, 2015, Petitioner filed the instant federal petition for writ of habeas corpus.

7    (ECF No. 1). Respondent has filed an answer to the petition and Petitioner has filed a traverse.

8    (ECF Nos. 12, 19).

9        In 2011, Petitioner was convicted in Kern County Superior Court of first-degree murder,

10   robbery, and active participation in a criminal street gang. The jury found to be true two special

11   circumstance allegations: that the murder was committed while Petitioner was engaged in a

12   robbery ("robbery-murder special circumstance"), and that the victim was intentionally killed

13   while Petitioner was an active participant in a criminal street gang and the murder was carried

14   out to further the activities of the criminal street gang ("gang-murder special circumstance"). The

15   jury also found true enhancement allegations of firearm use and commission of the offenses for

16   the benefit of a criminal street gang. Petitioner was sentenced to a term of life without the

17   possibility of parole, plus 25 years to life.

18       On appeal, the California Court of Appeal, Fifth Appellate District, reversed the gang

19   participation offense conviction and ordered a $200 parole revocation fine to be stricken. The

20   court affirmed the judgment in all other respects. People v. Casica, No. F063191, 2014 WL

21   1386677, at *37 (Cal. Ct. App. Apr. 9, 2014). Petitioner then filed a petition for rehearing in the

22   Fifth Appellate District, which was denied on April 29, 2014. (LDs[1] 54, 56). The California

23   Supreme Court denied Petitioner's petition for review on July 23, 2014. (LD 58).

24   \\

25   \\

26   \\

27

28   [1] "LD" refers to the documents lodged by Respondent on September 14, 2015.

# II.

## STATEMENT OF FACTS[2]

On April 26, 2010, the victim, Amber Kelch, invited Casica over to her house by text message, noting her live-in boyfriend would be leaving for work that evening and would be gone for four days. Casica responded he was bringing his "homie" with him. During the evening hours, Casica and Salas arrived at the victim's home in Bakersfield. The victim's teenage son Tim recalled two men coming over to the house that evening, and he allowed them inside while the victim was in the shower. Tim then went to his room and fell asleep while listening to music through headphones. He fell asleep sometime after 11:00 p.m. and did not wake during the night. Although he did not know the men at the time, Tim subsequently identified Casica in photographic lineups. Tim recalled his father, Michael Shawn Lovett, had two AR–15 style rifles at the time, which he often took to work with him.

Around midnight, Gilfred Cachola, the victim's drug dealer, delivered approximately $40 worth of methamphetamine to the victim at her home. When he dropped off the drugs he noticed two men at the victim's house. Subsequently, Michael Zimmerman began exchanging text messages with Salas, whom he knew as Sikes, regarding providing Salas with a ride. Zimmerman ultimately received directions to pick up Salas near the victim's home. Salas stated he wanted to "reup," which meant to get more drugs. Zimmerman drove Salas around town for about an hour and then dropped him off where he originally had picked him up.

Between 4:00 a.m. and 5:00 a.m. a woman Kassie Thompson knew as Dreamer asked her for a ride to pick up two men. Dreamer was very nervous at the time. Thompson drove Dreamer to the victim's house in her truck as directed by Dreamer, who was on the phone with someone providing directions. When they arrived at the victim's house, Casica and Salas emerged and put a rifle case in the back of the truck. The men also had a backpack. Defendants got into the truck and Thompson drove them back to her apartment where they removed the rifle case and backpack from the truck and parted ways. Salas told Thompson he was going to sell a PlayStation3 and give her money for gas for picking them up.

A few days later Casica, whom Thompson only knew by his moniker, Monster, showed her a picture of himself holding a rifle with another rifle visible in the background. He told her he had sold the guns for $780 although he had wanted $1,000 for them. Thompson also saw Casica with a handgun a few days after the murder.

Angela Aguilar, who goes by the name Dreamer, is Casica's girlfriend and the mother of one of Casica's children. Aguilar knows Casica is known as Monster. She testified she never asked Thompson for a ride or went with Thompson to pick up Casica and Salas. During the relevant time period, Aguilar lived with Marene Grimaldo, Salas's sister. There were times when both Salas and Casica would be at her apartment visiting, but the two never really talked to each other.

---

[2] The Fifth Appellate District's summary of the facts in the April 9, 2014 opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the state appellate court. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

Sometime before 10:00 a.m., the victim's son woke up and went to check on his mother since she did not wake him for school. He found her lying face down on her bed. He went to a neighbor's house for help and also called his father.

Bakersfield police officer Brian Looney responded to the victim's home and found her lying face down on the bed, deceased. The victim died from a single gunshot wound to the head that entered above her left ear. There were a number of papers on a tray on the bed, next to the victim's leg. Detective Michael Hale inspected the home after the murder and noted one of the papers found next to the victim had the words "Mr. Monster," a symbol known as a "kanpol," and the words "SSBKS" and "Southgate Lokos." Casica's fingerprints were on this paper.

In addition, Hale found baggies of methamphetamine in a case on the nightstand and noted the victim had a methamphetamine pipe in one hand and a lighter in the other. There were three blue cups with liquid located on a dresser in the bedroom, and a spent .380 shell casing under the bed. The house did not appear in disarray, and there were no signs of forced entry anywhere in the home. The detective also noticed an ammunition case with numerous .223–caliber rounds of ammunition on the floor in the front room of the house.

Casica's fingerprints were on the papers found next to the victim as well as on one of the blue cups and on the ammunition box. Salas's fingerprints were also on one of the blue cups. The victim's fingerprints were on the third blue cup. No fingerprints were located on the shell casing.

Michael Shawn Lovett was the victim's live-in boyfriend and father of her child. At the time of the homicide he owned two AR–15 rifles. The .223 ammunition was also his and was for the rifles. He worked in an oil field and often left home for five days at a time to work. He left the home between 7:00 and 7:30 p.m. on the night of April 26th to go to work. He kept his two guns in a single rifle case, which he left under the bed, before going to work on the day of the murder. He also owned several PlayStation video game systems. Both rifles, the rifle case, and a PlayStation3 system were missing after the murder. Lovett viewed People's exhibit 12, a photograph of Casica holding a rifle with another visible in the background and noted both guns looked like his. In addition, a rifle case in the photo looked like his missing gun case.

Detective Richard Dossey downloaded information from Casica's cellular telephone after Casica was arrested. People's exhibit 12 was a photograph on that phone, and the electronic information associated with this picture established the photograph was taken on April 27, 2010, at 3:41 p.m. In addition, Detective Dossey noted Casica had an entry in his contacts for a "Pablo" with a phone number associated with Salas. Subsequently, Detective Hale performed a search of a residence at an address Casica frequented. He found numerous items of graffiti at the residence with the markings "Mr. Monster," "SSBKS," "SSL," and "X3." In addition, he found "Bakers" written on a garbage can under the word "trash." A search of residences associated with Salas revealed no gang graffiti or indicia.

Grace Barela, Casica's sister, was the victim's best friend. She had introduced Casica to the victim and took him to the victim's home approximately a week before the murder. She recalled the victim sometimes talked about her boyfriend's guns.

***Cell Phone Evidence***

Jason Furnish, an investigator for the Kern County District Attorney's Office, testified as an expert regarding cellular telephone records. He analyzed telephone records for both Casica's and Salas's cellular telephones, including telephone calls and text messages. In addition, he was provided information as to the cellular phone tower used for each telephone call of each phone, and was able, with that information, to determine the general vicinity of the telephones at the times they made or received calls. Based on this analysis, Furnish determined the records were consistent with Casica's phone being located at the victim's address between 9:00 p.m. on April 26, 2010, and 5:29 a.m. on April 27, 2010. During that time period there were 60 calls on Casica's phone, and Furnish opined there was little or no movement of the phone. At 5:55 a.m., however, the telephone had moved to another region within Bakersfield.

Furnish determined Salas's telephone records were consistent with Salas also being at the victim's home from 10:34 p.m. on April 26, 2010, to 3:05 a.m. the next morning. The telephone moved at some point between 3:05 a.m. and 3:32 a.m. when it began using towers in another area of Bakersfield. However, the phone returned to the vicinity of the victim's home at 4:14 a.m. The last record of the phone using a tower that serviced the victim's address was at 5:14 a.m. The next call was not placed until 9:06 a.m. when the phone was in another area of Bakersfield.

In reviewing the text messages on Salas's phone, Furnish noted they had a signature of "Sikes" on them. There were several text messages between Salas and Zimmerman just before Salas's telephone began using towers in other areas of Bakersfield.

Between 10:32 p.m. and 11:04 p.m. there were four text messages between Salas and Casica. Initially, Salas sent Casica a message saying "No dome." A few minutes later, he sent another message saying "Tehatch first." Casica replied a few minutes later stating, "I HAVE 2 DOME HER." Twenty minutes later Salas replied, "To much eyes in the naborhood but we can do that unsuspected after." At 2:46 a.m., Salas text messaged Casica saying, "I got a plan." The term "dome" meant to shoot someone in the head.

In several text messages prior to the murder, Casica had stated he was "strapped," meaning he was armed with a firearm. None of those messages had been sent to Salas. On April 20, 2010, Casica sent a text message to an unidentified person stating, "HEY KEEP AN EYE OUT 4 SOME 380 BULLETS 4 ME."

The records were also consistent with Casica having visited the victim's home for several hours on the morning of April 18, 2010.

***Gang Evidence***

The parties stipulated the South Side Bakers and the Varrio Bakers were criminal street gangs within the meaning of section 186.22.

Jessica Young, the mother of one of Casica's children, testified Casica is a member of the South Side Bakers and goes by the name Monster. Juan Flores is a longtime friend of Casica. Although Flores admitted previously belonging to the South Side Bakers, he claimed he was no longer active within the gang and stated he did not know if Casica was a member. He claimed he had never heard of the

Southgate Lokos and did not know what a kanpol was. Flores had received several letters from Casica after Casica's arrest in this case; the letters were seized by the police during a search of Flores's home. Flores claimed not to know what the contents of the letters meant.

Casica had several tattoos when he was arrested. Among them were the letters "SSBKS" in large letters across his back, the word "Bakers" down his right arm, "South Side" across his chest, and "Monster" on the right side of his chest. At the time of his arrest, Casica was wearing a baseball cap with the Superman logo on it, i.e., a large "S" on a pentagon-shape shield.

Salas had several contacts with law enforcement. In 2002, Salas admitted he was a Varrio Bakers member and had been since the age of 13. He used the moniker "Psycho," which had been used by one of his deceased brothers. In 2007, Salas was contacted with another member of Varrio Bakers, Roberto Hurtado. Both men claimed membership in the Varrio Bakers. That same year, Salas was again contacted and he was wearing dog tags inscribed with the name "Lil Cyco," VBKS, and the number 13. In December of that same year when he was contacted by law enforcement, Salas stated he used to be a Varrio Bakers gang member.

Detective William McNeal was involved in the investigation of the homicide of Cruz Martinez, "Bam Bam," in November of 2010. Martinez was a South Side Baker who was killed by a Varrio Baker over an incident where Martinez had brandished a gun at the Varrio Baker. As a result, a meeting was held between the gangs, and Martinez was ultimately killed by a Varrio Baker. Detective McNeal characterized the two gangs as rivals, but noted that members of the two gangs could associate outside of the gang. Both the Varrio Bakers and South Side Bakers are part of the larger Sureño organization.

Bakersfield police officer Eric Littlefield testified as an expert regarding criminal street gangs. During the course of his duties, he spoke to members of criminal street gangs daily and often discussed their current rivalries. Gangs generally fall along racial lines. There are several Hispanic gangs in the Bakersfield area, including the Varrio Bakers, Colonia Bakers, Loma Bakers, East Side Bakers, West Side Bakers, South Side Bakers, Brown Pride Locos, and Okie Bakers. The majority of these gangs are affiliated with the Sureños, which is subservient to the Mexican Mafia. The number 13 is significant to the gangs that fall under the Sureño ideology and it represents the letter "M," the 13th letter of the alphabet. The letter "M" is important because it stands for the Mexican Mafia, the overall governing body for the Sureños and all other gangs falling under the Sureño ideology. Littlefield explained the Mexican Mafia sets the rules of conduct for all Sureños and the other gangs falling under the Sureño ideology. The number 13, the letter "M," and the color blue are common gang symbols in the Sureño ideology. Gang members sometimes use the term "sur," meaning south in Spanish, to identify themselves as affiliating with Sureño ideology.

People can become members of a gang by being "jumped in," meaning they are beaten by other members of the gang for a predetermined amount of time. They can also "put in work" for the gang, meaning they engage in criminal acts on behalf of the gang. In gang culture, respect is very important, and disrespect can be dealt with violently. Generally, members are proud of their gang affiliation and will often get tattoos to announce their gang status.

Littlefield was familiar with the Varrio Bakers street gang through his investigations. The Varrio Bakers are rivals with the Okie Bakers and Colonia

Bakers, although all are subsets of the larger Sureño organization. As such, members of the gangs would also be members of the Sureño organization. The Varrio Bakers use various signs and symbols, including a kanpol, which is the Mayan or Aztec symbol for the number 13 and consists of three horizontally aligned dots above two parallel horizontal lines.

The Varrio Bakers use the symbols "V," "VB," and "VBKS" to identify their gang. "BKS" is also a common abbreviation used among several Bakersfield gangs that signifies they are from that area. Littlefield identified some photographs of tattoos and graffiti showing members of both the Varrio Bakers and South Side Bakers used symbols such as the kanpol, the number 13, and the word "sur."

Littlefield identified photographs of Salas, one with him wearing a jersey with the number 13, and one showing a tattoo of the word "Bakers" on his abdomen, common symbols of the Sureño organization.

Littlefield reviewed photographs, interview cards, and booking information for Salas. He determined Salas used the moniker Cyco or Lil Cyco, and he had identified himself as either South or Varrio Baker when asked if he had any gang affiliation. Additionally, in March of 2007 Salas was contacted in the company of Roberto Hurtado, "Stranger," and both men admitted membership in the Varrio Bakers. Furthermore, Littlefield reviewed six offense reports involving Salas. Based upon Salas's tattoos, booking information, self-admission, the other reports reviewed, and a photograph of Salas wearing a "13" jersey, Littlefield opined Salas was an active member of the Varrio Bakers street gang.

The South Side Bakers are another subset of the Sureño organization. Littlefield has had numerous contacts with its members and is familiar with the gang. The Southgate Lokos is a subset of the South Side Bakers. Littlefield identified photographs of South Side Bakers' graffiti and tattoos highlighting the use of the kanpol, the number 13, and the color blue. In addition, he provided a photograph of a man with tattoos relating to both the South Side Bakers and the Southgate Lokos, thus demonstrating the relationship between the gangs.

Littlefield testified the initials SSBKS and SSB referred to the South Side Bakers. The South Side Bakers also use the Superman logo as a symbol of their gang. However, this symbol would not use the color red as red is the color of their rivals, the Norteños. SGL and SGLKS stand for Southgate Lokos.

Littlefield reviewed pictures of Casica's tattoos consisting of "Monster" on the right side of his chest, "South Side" across his chest from shoulder to shoulder, "SSBKS" in large letters across his back, and "Bakers" down his arm. In addition, Littlefield reviewed the paper found next to the victim's body, which had "MR MONSTER," "SSBKS," "SOUTHGATE LOKOS," and a kanpol written on it. This paper had significance within the gang culture as it displayed the gang name, and also because it showed the gang's rivalries with the Norteños and the Okie Baker gang. This was demonstrated by the fact the letters "n" and "o" were crossed out in the writing. People's exhibit 50 represented additional gang writing showing Southgate with the letters "n" and "o" crossed out, and the number 13. Writing graffiti on items can be "putting in work" for the gang.

Littlefield reviewed people's exhibit 12, a picture of Casica wearing a hat with the Superman logo. Significantly, the "S" in the logo is not in its usual red, which is the rival Norteño color. Casica's "Bakers" tattoo is visible on his exposed arm and

he is holding an assault-type rifle with another rifle visible in the background. These firearms are considered very valuable within the gang, and having them gives a person status and respect within the gang.

Littlefield reviewed booking information for Casica, finding he claimed the Sureño and South Side Bakers; in his most recent three bookings he also claimed the subset Southgate Lokos. After reviewing Casica's tattoos and booking information, Littlefield opined Casica was an active member of the South Side Bakers.

Littlefield did not believe the South Side Bakers and Varrio Bakers were rival gangs. Littlefield was aware of the Cruz Martinez murder in 2010. Martinez was killed by Encarnacion Barrientos, a Mexican Mafia member, during a meeting in which members of both the Varrio Bakers and South Side Bakers were present. The killing had to do with disrespect Martinez had shown to Barrientos and disrespect from a South Side Baker toward a Varrio Baker. Significantly, Littlefield did not consider Barrientos a member of the Varrio Bakers, noting he had the word "Shafter" tattooed across his forehead.

After being presented with a hypothetical based upon the facts of this case, Littlefield opined a murder and robbery could benefit both the Varrio Bakers and South Side Bakers street gangs. Crimes of violence, such as homicides, build fear and intimidation within the community that, in turn, benefits the gangs by allowing them to commit crimes with impunity. Committing a murder gives gang members and the gang as a whole respect. The gang becomes more feared and the gang members who commit the crimes earn or gain status within the gang. Furthermore, firearms are extremely valuable within the gang, and the theft of assault-type rifles gives the gang members additional respect. Littlefield opined the two gangs in the hypothetical—the Varrio Bakers and South Side Bakers— would each benefit from the actions because the two gangs were not rivals and the two have an ongoing sense of cooperation. If, however, the crime would have been committed by rival members, then Littlefield would not find mutual gang purpose in the crimes.

Several letters written by Casica were admitted into evidence. In one letter Casica wrote to his "Southgate Loko & brother" Juan Flores. Casica stated he had "put in so much work, and I'm not going to stop either, you know? I want my hood to be proud of me" and he could not wait to "blast" (tattoo) the initials SSBKS and SGL as well as a kanpol on his face. Casica signed the letter with his "Southgate love, respects & loyaltys" and used his moniker Monster, as well as SSB, SGL, and a kanpol. In another letter to Flores, Casica acknowledged the murder of Martinez stating, "To be honest I didn't care for Bams, but I can't let something like that go unpunished & avenged [sic], right?" On the envelope of the letter, there is an "S" inside of an inverted triangle.

People v. Casica, 2014 WL 1386677, at *1-6 (footnote omitted).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

8

or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of Kern County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); <u>Davis v. Ayala</u>, 135 S. Ct. 2187, 2198 (2015); <u>Harrington v. Richter</u>, 562 U.S. 86, 97-98 (2011); <u>Williams</u>, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, the "AEDPA's highly deferential standards" apply. <u>Ayala</u>, 135 S. Ct. at 2198. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. <u>Cone v. Bell</u>, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. <u>Moses v. Payne</u>, 555 F.3d 742,

754 (9th Cir. 2008) (alterations in original) (quoting <u>Wright v. Van Patten</u>, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is governing clearly established Federal law, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Richter</u>, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "resulted in 'actual prejudice.'" <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (quoting <u>United States v. Lane</u>, 474 U.S. 438, 449 (1986)).

**IV.**

**REVIEW OF CLAIMS**

**A. Appellate Court's Failure to Address Sufficiency of the Evidence for the Gang-Murder Special Circumstance**

Petitioner asserts that his due process rights were violated when the Fifth Appellate District declined to rule whether there was sufficient evidence to support a finding on the gang-murder special circumstance on the basis that a reversal would not change Petitioner's sentence.

\\

1   (ECF No. 1 at 31-33).[3] Respondent argues that this claim is not cognizable because Petitioner is

2   not attacking his custodial sentence—even with a favorable ruling, Petitioner's custody and

3   sentence remain the same. Moreover, Respondent argues that Petitioner has failed to show how

4   the state court's decision not to rule on the sufficiency of evidence was objectively unreasonable

5   in light of clearly established federal law. (ECF No. 12 at 25).

6          The sufficiency of evidence claim was presented on direct appeal to the California Court

7   of Appeal, Fifth Appellate District, which declined to rule on the claim in a reasoned decision.

8   The California Supreme Court summarily denied review. As federal courts review the last

9   reasoned state court opinion, the Court will "look through" the California Supreme Court's

10  summary denial of Petitioner's petition for review and examine the decision of the Fifth

11  Appellate District. Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991); Johnson v. Williams, 133 S.

12  Ct. 1088, 1094 n.1 (2013).

13         In declining to rule on whether there was sufficient evidence to support a finding of the

14  gang-murder special circumstance, the Fifth Appellate District stated:

15                 We need to address defendants' arguments as they relate to the
                   gang-murder special circumstance. The sole purpose of a special
16                 circumstance finding is to mandate a sentence of life without the
                   possibility of parole. . . . At sentencing the court imposed the life-
17                 without-the-possibility-of-parole sentence based solely upon the
                   robbery-murder special circumstance. The court never mentioned
18                 the gang-murder special circumstance when it imposed the
                   sentence in this case. Further, we note the abstracts of judgment for
19                 both defendants reflect only the robbery-murder special
                   circumstance. As any error in finding the gang-murder special
20                 circumstance true was necessarily harmless, we need not address
                   the issue.
21

22  Casica, 2014 WL 1386677, at *10.

23         The Court cannot reach the merits of a habeas corpus claim unless it concludes that it has

24  jurisdiction. By statute, federal courts "shall entertain an application for a writ of habeas corpus

25  [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground

26  that he is in custody in violation of the Constitution or laws or treaties of the United States." 28

27

28  [3] Page numbers refer to the ECF page numbers stamped at the top of the page.

1    U.S.C. § 2254(a). As § 2254(a)'s "in custody" requirement is jurisdictional, "it is the first

2    question [the Court] must consider." <u>Bailey v. Hill</u>, 599 F.3d 976, 978 (9th Cir. 2010) (quoting

3    <u>Williamson v. Gregoire</u>, 151 F.3d 1180, 1182 (9th Cir. 1998)).

4          Section 2254(a)'s language "explicitly requires a nexus between the petitioner's claim

5    and the unlawful nature of the custody." <u>Bailey</u>, 599 F.3d at 980. That is, the remedy that the

6    petitioner seeks should "directly impact—and [be] directed at the source of the restraint on—his

7    liberty." <u>Id.</u> at 981.

8          California requires a jury to find as true the existence of one or more enumerated special

9    circumstances beyond a reasonable doubt in order to impose a sentence of life without the

10   possibility of parole for a defendant found guilty of first-degree murder. Cal. Pen. Code §§

11   190.2, 190.4. The California Supreme Court has stated that "special circumstances are *sui*

12   *generis*—neither a crime, an enhancement, nor a sentencing factor" and has rejected the

13   "unfounded assumption that special circumstances should be treated as being identical to

14   criminal offenses in all contexts." <u>People v. Montes</u>, 58 Cal.4th 809, 874 (2014) (denying claim

15   that special circumstance finding must be reversed for being necessarily included within another

16   special circumstance) (quoting <u>People v. Garcia</u>, 36 Cal.3d 539, 552 (1984)).

17         The jury in Petitioner's case found to be true the robbery-murder special circumstance

18   and the gang-murder special circumstance. At sentencing, the trial court imposed Petitioner's

19   sentence of life without the possibility of parole based solely on the robbery-murder special

20   circumstance. Although the court had stated earlier in the sentencing proceeding that the jury had

21   found to be true "the PC 190.2(a)(22), special circumstance, murder while active member of a

22   criminal street gang," the court did not mention the gang-murder special circumstance when

23   sentencing Petitioner on the first-degree murder count. (LD 30 at 3117, 3124). Moreover, both

24   the minute order of the sentencing proceeding and the abstract of judgment do not include the

25   gang-murder special circumstance and only reflect the robbery-murder special circumstance.[4]

26   (LD 6 at 1621-22, 1629-32).

27   _____

28   [4] The Court notes that the robbery-murder special circumstance is an independent and sufficient basis for imposition
of a sentence of life without the possibility of parole. <u>See</u> Cal. Pen. Code § 190.2(a)(17)(A).

1    As stated above, special circumstance findings do not constitute separate criminal

2    offenses. Although the jury found the gang-murder special circumstance to be true beyond a

3    reasonable doubt, Petitioner was not convicted of a separate criminal offense and the court did

4    not impose the sentence of life without the possibility of parole based upon the gang-murder

5    special circumstance. There is no nexus between Petitioner's claim that the appellate court erred

6    in declining to rule whether there was sufficient evidence to support a finding on the gang-

7    murder special circumstance and the unlawful nature of Petitioner's custody because Petitioner is

8    in custody for life without the possibility of parole based solely on the robbery-murder special

9    circumstance. As the required nexus between Petitioner's gang-murder special circumstance

10   claim and the unlawful nature of his custody is absent, the Court does not have jurisdiction to

11   hear this claim. Accordingly, Petitioner's first claim for relief must be dismissed.

12   **B. Trial Court's Decision to Allow the Prosecution to File Reasons for Striking
        Certain Jurors Under Seal**

13

14   Petitioner contends that the trial court violated his federal constitutional rights with the

15   procedure it undertook after Petitioner raised objections under <u>Batson v. Kentucky</u>, 476 U.S. 79

16   (1986), and <u>People v. Wheeler</u>, 22 Cal.3d 258 (1978), to the prosecution's peremptory challenges

17   of certain prospective jurors. After ruling that the defense failed to make a *prima facie* case of

18   racial discrimination except as to one juror, the court invited the prosecutor to comment on his

19   reasons for striking the other jurors and granted the prosecutor's request to file the reasons under

20   seal. (ECF No. 1 at 39-40). Respondent argues that because the state court correctly applied

21   United States Supreme Court precedent, Petitioner's second ground for relief must be rejected.

22   (ECF No. 12 at 33).

23   Petitioner's claim regarding the <u>Batson</u>/<u>Wheeler</u> procedure undertaken by the trial court

24   was presented on direct appeal to the California Court of Appeal, Fifth Appellate District, which

25   held that the filing of reasons for striking certain jurors under seal did not violate Petitioner's

26   right to be present at the hearing, to be assisted by counsel, to an adversarial process, or to due

27   process of law. <u>Casica</u>, 2014 WL 1386677, at *23. The California Supreme Court summarily

28   denied review. The Court reviews the last reasoned state court opinion. <u>Ylst</u>, 501 U.S. at 806.

In denying Petitioner's <u>Batson</u>/<u>Wheeler</u> procedural claim, the Fifth Appellate District stated:

> This was not a situation where (1) a prima facie case was found, (2) the prosecutor actually gave reasons for the challenges directly to the court, (3) the court actually considered those reasons under a third prong *Batson* analysis, and (4) the defense was denied an opportunity to evaluate and possibly rebut the reasons or make a full factual record. Rather, the trial court found no prima facie case of discrimination on the record in open court and in the presence of all parties. The trial court's ruling regarding the failure to state a prima facie case of discrimination was necessarily based upon the showing made in open court with all counsel and parties present. The subsequent filing of the prosecutor's reasons, under seal and after the ruling had been made, could not have altered the trial court's ruling in any way. Defendants were never denied any opportunity to rebut any reasons given because the reasons were never considered.
>
> . . . Here, there is no evidence the trial court ever reconsidered its ruling that defendants failed to meet their burden to establish a prima facie case of discrimination. . . . We therefore reject defendants' claim the mere filing of the sealed declaration, after the trial court's ruling, constituted reversible error.

<u>Casica</u>, 2014 WL 1386677, at *25.

Constitutional review of allegedly discriminatory peremptory challenges to prospective jurors in federal and state trials is governed by the standard established by the United States Supreme Court in <u>Batson v. Kentucky</u>, 476 U.S. 79, 89 (1986). In <u>Batson</u>, the United States Supreme Court set forth a three-step process for trial courts to follow to determine whether a peremptory challenge has been exercised on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment. <u>Ayala</u>, 135 S. Ct. at 2190 (citing <u>Snyder v. Louisiana</u>, 552 U.S. 472, 476-77 (2008)). First, the defendant must make a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race. <u>Id.</u> That is, the defendant must demonstrate "that the totality of the relevant facts give rise to an inference of discriminatory purpose." <u>Batson</u>, 476 U.S. at 93-94. Second, if the defendant makes this showing, the burden then shifts to the prosecution to provide a race-neutral explanation for its challenge. <u>Id.</u> Third, the trial court must determine if the defendant has proven purposeful discrimination, which involves "evaluating 'the persuasiveness of the justification' proffered by the prosecutor[.]" <u>Id.</u> (quoting <u>Purkett v. Elem</u>, 514 U.S. 765, 768 (1995)).

14

During *voir dire*, defense counsel made a <u>Batson</u>/<u>Wheeler</u> motion after the prosecution exercised ten peremptory challenges, five of which were exercised against jurors with Hispanic surnames and one against an African-American juror. <u>Casica</u>, 2014 WL 1386677, at *15 & n.9. The trial court found that the defense had established a *prima facie* case only as to one juror, Miss R., and not to the remaining five. The trial court then asked the prosecutor, "Do you care to give an explanation for the challenge on Miss [R.] or comment in regard to the other named jurors you excused of apparent Hispanic origin that might indicate why they were excused on a non-race-neutral—a non-race issue." <u>Id.</u> at *16. After reconfirming for the prosecutor that the court found that a *prima facie* case had been established only as to Miss R., the trial judge again stated, "but you can comment on the others, as well." <u>Id.</u> The prosecutor declined to comment, but requested leave to file under seal his reasons for dismissing the other jurors. The trial court granted the request. After going through the <u>Batson</u> three-step process as to Miss R., the trial court reiterated, "based on my recollection of the other jurors that have been—that you did excuse, Hispanic surnames, that there has been a failure to establish an inference that they were excused because of group or race reasons. And as I indicated, we deny the Wheeler-Batson as to those individuals." <u>Id.</u> at *17.

The Fifth Appellate District's decision was not contrary to any clearly established federal law since the United States Supreme Court has not addressed whether *ex parte* <u>Batson</u> proceedings or communications violate federal constitutional rights. <u>See</u> <u>Ayala</u>, 135 S. Ct. at 2197 ("Ayala contends that his federal constitutional rights were violated when the trial court heard the prosecution's justifications for its strikes outside the presence of the defense, but we find it unnecessary to decide that question.").

The state court decision was not an unreasonable application of clearly established federal law. The Fifth Appellate District correctly set forth <u>Batson</u>'s three-step process and recognized that <u>Wheeler</u>, California's analogue to <u>Batson</u>, follows the same framework. The appellate court found that the trial court properly engaged in <u>Batson</u>'s first step to determine whether the defense had made a *prima facie* showing that the peremptory challenges had been exercised on the basis of race. The trial court departed from the normal course of proceeding by

1    allowing the prosecutor to file his reasons for excluding certain jurors in a sealed declaration,

2    ostensibly for purposes of appellate review, even after the court found no *prima facie* showing

3    had been made. The Fifth Appellate District's ruling that the procedure did not violate

4    Petitioner's federal constitutional rights is not "so lacking in justification that there was an error

5    well understood and comprehended in existing law beyond any possibility for fairminded

6    disagreement." Richter, 562 U.S. at 103. The record establishes that the trial judge made his

7    ruling that the defense failed to make *prima facie* showings of racial discrimination as to all

8    named jurors except Miss R. prior to the filing of the prosecutor's sealed declaration. Thus, the

9    trial court's ruling did not rely upon the sealed declaration. Further, nothing in the record

10   supports the contention that the trial judge reconsidered his ruling after the prosecutor's sealed

11   declaration was filed. As fairminded jurists could disagree whether the state court's decision

12   conflicts with the Supreme Court's precedents, the Court must defer to the state court's decision.

13   Accordingly, Petitioner is not entitled to habeas relief on his second claim and it must be denied.

14       **C.  Trial Court's Decision Not to Sever Trial**

15       Petitioner alleges he suffered a violation of his right to due process because as a result of

16   the trial court's decision not to sever his trial, he was subjected to admission of prejudicial

17   evidence relating to his codefendant. (ECF No. 1 at 42). Petitioner also alleges that he was

18   adversely affected by the ineffective assistance of codefendant's counsel in the course of the

19   joint trial because he "had little ability to prepare for or control Mr. Casica's trial attorney's

20   questions to an adverse witness which elicited improper and harmful evidence." (Id. at 41).

21   Respondent argues that the severance claim is an issue of state law and the state appellate court

22   reasonably found Petitioner was not denied due process by being tried with his codefendant.

23   (ECF No. 12 at 40).

24       Petitioner's severance claim was presented on direct appeal to the California Court of

25   Appeal, Fifth Appellate District, which found that Petitioner was not denied due process or a fair

26   trial from the denial of the motion to sever the cases. Casica, 2014 WL 1386677, at *10. The

27   Fifth Appellate District also found that the ineffective assistance of counsel issue was not

28   sufficiently raised on appeal and that it necessarily failed because Petitioner could not establish

1  prejudice. Id. at *14. The California Supreme Court summarily denied review. The Court

2  reviews the last reasoned state court opinion. Ylst, 501 U.S. at 806.

3      1.  Misjoinder

4      In United States v. Lane, the Supreme Court stated in a footnote that "misjoinder would

5  rise to the level of a constitutional violation only if it results in prejudice so great as to deny a

6  defendant his Fifth Amendment right to a fair trial." 474 U.S. 438, 446 n.8 (1986). However, the

7  Ninth Circuit has held that this footnote does not qualify as "clearly established Federal law"

8  under the AEDPA and that "[t]here is no clearly established Supreme Court precedent dictating

9  when a trial in state court must be severed." Martinez v. Yates, 585 F. App'x 460, 460 (9th Cir.

10 2014) (citing Collins v. Runnels, 603 F.3d 1127, 1132 (9th Cir. 2010) and Runningeagle v. Ryan,

11 686 F.3d 758, 774 (9th Cir. 2012)).

12     As there is no clearly established federal law governing when a trial in state court must be

13 severed, the Court must defer to the state court's decision. Accordingly, Petitioner is not entitled

14 to habeas relief on his third claim and it must be denied. To the extent that Petitioner is asserting

15 independently the due process and ineffective assistance of counsel arguments underlying his

16 severance claim, those are addressed below.

17     2.  Due Process

18     In denying Petitioner's claim that "his right to due process was violated in the course of

19 the joint trial based upon the evidence actually admitted," the Fifth Appellate District stated:

20     In arguing the evidence of Casica's gang involvement was unduly prejudicial, and
21     therefore a violation of his right to due process, Salas relies on People v.
       Albarran (2007) 149 Cal.App.4th 214. There, the appellate court found the
22     admission of gang evidence violated due process and rendered the trial
       fundamentally unfair. (Id. at p. 232.) The court summarized the law applicable to
23     a due process claim as follows:

24         "To prove a deprivation of federal due process rights, [a defendant] must
           satisfy a high constitutional standard to show that the erroneous admission
25         of evidence resulted in an unfair trial. 'Only if there are no permissible
           inferences the jury may draw from the evidence can its admission violate
26         due process. Even then, the evidence must "be of such quality as
           necessarily prevents a fair trial." [Citations.] Only under such
27         circumstances can it be inferred that the jury must have used the evidence
           for an improper purpose.' [Citation.] 'The dispositive issue is ... whether
28         the trial court committed an error which rendered the trial "so 'arbitrary

17

and fundamentally unfair' that it violated federal due process." [Citation.]' [Citation.]" (*People v. Albarran, supra,* at pp. 229–230.)

. . . .

The instant case is not "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*People v. Albarran, supra,* 149 Cal.App.4th at p. 232.) . . . .

Specifically, section 186.22, subdivision (b) required proof that Salas committed the crimes "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Proof of a violation of this section may be established by showing Salas acted to benefit his own gang or that he acted to further Casica's gang. (*People v. Morales, supra,* 112 Cal.App.4th at p. 1198; *People v. Villalobos, supra,* 145 Cal.App.4th at p. 322.) Under these theories, the evidence relating to Casica's gang affiliation was relevant to show Salas's knowledge of Casica's gang affiliation, as well as to show either his intent to benefit Casica's gang or his intent to commit the crime in association with Casica. Likewise, evidence of Salas's own gang affiliation is relevant to show his intent to benefit his own gang or to show the cooperation between the gangs. Therefore, the evidence of both defendants' gang affiliation and the other gang evidence was still relevant to the charges against Salas.

More importantly, the expert testimony regarding the criminal activities of the South Side Bakers and Varrio Bakers was not similar to the sensational and prejudicial testimony admitted in *People v. Albarran.* It cannot go unnoticed that Littlefield never addressed any prior criminal conduct allegedly committed by Salas. Furthermore, there was very little evidence regarding the criminal conduct of either gang. Littlefield never testified to the primary activities of either gang or to any specific criminal conduct by other gang members as these elements were met through the stipulations. Rather, much of the testimony was centered on how gangs operate and their ideology.

The gang evidence in this case was no more sensational than the evidence as to the murder and robbery charges against Salas. We cannot say the nature and quantity of the evidence was such that it must have affected the jurors' resolution of the substantive issues. Thus Salas's due process contention fails.

Casica, 2014 WL 1386677, at *13-14 (footnote omitted).

Admission of evidence is an issue of state law, and errors of state law do not warrant federal habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 67 (1991). The pertinent question is whether the state proceedings satisfied due process and "[t]he admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir.1995)). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation

1   sufficient to warrant issuance of the writ [of habeas corpus].” <u>Holley</u>, 568 F.3d at 1101. Because

2   there is no Supreme Court case establishing the fundamental unfairness of admitting prejudicial

3   evidence, the Court must defer to the state court’s decision. Accordingly, Petitioner is not

4   entitled to habeas relief on his due process claim and it must be denied.

5         3.   <u>Ineffective Assistance of Counsel</u>

6         In rejecting Petitioner’s ineffective assistance of counsel argument, the Fifth Appellate

7   District stated:

8           Finally, Salas presents a novel argument, claiming his “trial
        attorney was unable to prepare for or control Casica’s trial

9           attorney’s questions to adverse witnesses.” He claims those
        questions “led to testimony damaging to [Salas’s] defense.”

10          Severance, he claims, would have “prevented this problem and
        assured [Salas’s] right to a fair trial.” Salas does not support this

11          argument with any analysis or authority, other than a citation to the
        general right to effective assistance of counsel. Because he just

12          presents the above conclusory statement, the issue has not
        sufficiently been raised on appeal. However, we note that, even if

13          raised, Salas would be unable to satisfy the prejudice required to
        effect a claim of ineffective assistance of counsel. As we have

14          already explained, the gang expert testimony Salas complains of
        was not prejudicial. Thus, his claim necessarily fails.

15          (See <i>Strickland v. Washington</i> (1984) 466 U.S. 668,
        694 [defendant must demonstrate reasonable probability of more

16          favorable outcome without the error].)

17  <u>Casica</u>, 2014 WL 1386677, at *14.

18        If a petitioner’s claim has been adjudicated on the merits in state court, the AEDPA’s

19  deferential standards apply; otherwise, the claim is reviewed <i>de novo</i>. <u>Cone</u>, 556 U.S. at 472.

20  “Under AEDPA, an adjudication on the merits is ‘a decision finally resolving the parties’ claims

21  . . . that is based on the substance of the claim advanced, rather than on a procedural, or other,

22  ground.’” <u>Amado v. Gonzalez</u>, 758 F.3d 1119, 1130 (9th Cir. 2014) (quoting <u>Lambert v.</u>

23  <u>Blodgett</u>, 393 F.3d 943, 969 (9th Cir. 2004)). In determining whether the state court’s

24  adjudication was on the merits or procedural, the Court considers the reasons, if any, set forth in

25  the state court decision. <u>Amado</u>, 758 F.3d at 1131 (citing <u>James v. Ryan</u>, 733 F.3d 911, 916 (9th

26  Cir. 2013)). AEDPA deference also applies to alternative holdings on the merits. <u>Calbourne v.</u>

27  <u>Ryan</u>, 745 F.3d 362, 383 (9th Cir. 2014).

28        \\

1    In this case, the Fifth Appellate District found that the ineffective assistance of counsel

2 issue "ha[d] not sufficiently been raised on appeal" because Petitioner presented conclusory

3 statements without support. Casica, 2014 WL 1386677, at *14. However, citing to Strickland v.

4 Washington, the court went on to state that "even if raised, [Petitioner] would be unable to

5 satisfy the prejudice required to effect a claim of ineffective assistance of counsel. As we have

6 already explained, the gang expert testimony [Petitioner] complains of was not prejudicial. Thus,

7 his claim necessarily fails." Casica, 2014 WL 1386677, at *14. Given that the Fifth Appellate

8 District proceeded to address the merits of the claim and because its conclusion that the "claim

9 necessarily fails" was based on Petitioner's failure to satisfy Strickland's prejudice prong, the

10 Court finds that AEDPA deference applies to the state court's decision on the ineffective

11 assistance of counsel issue.

12    The clearly established federal law governing ineffective assistance of counsel claims is

13 Strickland v. Washington, which requires Petitioner to show (1) that "counsel's performance was

14 deficient" and (2) "that the deficient performance prejudiced the defense." 466 U.S. 668, 687

15 (1984). The proper inquiry in assessing prejudice under Strickland is "whether it is 'reasonably

16 likely' the result would have been different. . . . The likelihood of a different result must be

17 substantial, not just conceivable." Richter, 562 U.S. at 111-12 (citing Strickland, 466 U.S. at 696,

18 693).

19    Petitioner asserts that he was adversely affected by the ineffective assistance of

20 codefendant's counsel because he "had little ability to prepare for or control Mr. Casica's trial

21 attorney's questions to an adverse witness which elicited improper and harmful evidence." (ECF

22 No. 1 at 41). The allegedly prejudicial testimony at issue involved the following exchange

23 between codefendant Casica's attorney and gang expert Officer Littlefield:

24    "[Casica's counsel]: I believe [Salas's attorney] had asked you
      whether or not you conducted any research with regard to whether
25    a Varrio and a South Side would be allowed to cooperate in a
      homicide. Recall that?

26
      "[Littlefield]: I believe he asked me if I asked anybody if they
27    would be allowed to cooperate.
      "[Casica's counsel]: Right. [¶] And your answer was no?

28

"[Littlefield]: That I didn't specifically ask if they were allowed to cooperate.

"[Casica's counsel]: Okay. So you've never asked anybody— you've never asked a Varrio member whether or not they would be allowed to cooperate with a South Side to commit a homicide.

"[Littlefield]: That's not correct, sir.

"[Casica's counsel]: You have?

"[Littlefield]: The question he asked me is if I asked specifically if they would not be allowed to. I have asked the specific question of several Varrio Baker members involving this case individually after picking up the expert testimony for it."

Casica, 2014 WL 1386677, at *26.

After a defense objection and sidebar conference, the trial court determined it would hold a hearing to allow further inquiry of the expert. Prior to the hearing, the court admonished the jurors that they were "not to give any weight or regard whatsoever to the last question and answer. Don't let it affect your verdict in this matter. Give it no weight or regard." Id. During the subsequent hearing, the following exchange took place:

"[LITTLEFIELD]: In the context of the questions I misunderstood what he was asking me because I was asked if I was—if I ever asked the specific question if they were forbidden or not allowed to—

"THE COURT: Cooperate in general?

"[LITTLEFIELD]: If I asked the specific question if they were not allowed to cooperate in general and I must have misunderstood his question about specifically a homicide....

"THE COURT: So what would your response be if it's specifically directed to a homicide?

"[LITTLEFIELD]: To a homicide, no, I've never specifically asked if they're forbidden or allowed to commit a homicide together."

Id. at *27. In denying the defense motion for mistrial, the trial judge stated, "I don't feel that given the contemporaneous admonition to the jury to disregard the question and answer that there has been any infringement on the defendants' respective rights to a fair trial or any prejudice to either defendant form the proceedings that took place." Id. at *28. Subsequently, the court gave the jury an additional admonishment:

> "Now, this morning, ladies and gentlemen, in a brief hearing outside of your presence Officer Littlefield testified that he had misunderstood the question that drew the objection and he stated that he never asked any Varrio Bakers member whether Varrio Bakers would be allowed to, permitted, or prohibited from cooperating with South Side Bakers in the commission of a homicide. You are to entirely disregard Officer Littlefield's answer and the preceding questions on that subject."

Id.

In ruling that Petitioner was not prejudiced by the exchange between the gang expert and codefendant Casica's attorney, the Fifth Appellate District stated:

> Initially, we note defendants' arguments are based upon the erroneous premise that the question and answer disclosed some prejudicial information to the jury and demonstrated relevant information was withheld from the defense. A fair reading of the record does not demonstrate any prejudicial information was provided to the jury, or that any relevant information was withheld. Instead, the record supports the trial court's conclusion Littlefield misunderstood the question asked of him, believing he was asked about general instances of cooperation or alliances between the gangs.
>
> This case is unlike the cases to which defendants analogize where improper uncharged misconduct evidence was provided to the jury (*People v. Gibson* (1976) 56 Cal.App.3d 119, 130), or where highly prejudicial and inadmissible statements were admitted during the trial (*Krulewitch v. United States* (1949) 336 U.S. 440, 441–442). Here, the objected-to testimony consisted of a question and an answer that provided no information to the jury as to whether the gangs were specifically allowed to cooperate with each other in violent crimes together. Not so. The question and answer at issue at most insinuated the officer had *asked* gang members whether the two gangs could cooperate together in the commission of a homicide. The testimony did not indicate whether he had gotten a response or what the response was. To the extent one could argue the jury was left to wonder what the answer to the officer's question was or why the jury was not informed of the answer, we note not only was the jury immediately instructed to disregard the question and answer, but was further instructed the officer had actually misunderstood the question posed by defense counsel and he had not in fact asked gang members if the two gangs could cooperate in a homicide. In light of these admonitions, it is clear there could be no prejudice to the defense as no information was given, and the jury was affirmatively instructed the officer had misunderstood the question and never asked if the gangs could cooperate in violent crimes together.
>
> We also reject defendants' assertion the jury could not properly follow the court's admonition. As the Supreme Court has stated:
>
> > "We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, [citation], and a strong likelihood that the effect of the evidence would be 'devastating' to

the defendant, [citation]." (*Greer v. Miller* (1987) 483 U.S. 756, 766, fn. 8.)

Nothing in the exchange leads to the conclusion the jury could not follow the instruction that the officer simply misunderstood the question and had never asked the question the defense argued was implied. Thus, defendants could not have been prejudiced by the exchange.

Casica, 2014 WL 1386677, at *30-31.

The Fifth Appellate District's decision was not contrary to any clearly established federal law since the Supreme Court has not applied Strickland to counsel for a jointly tried codefendant. Additionally, it was not unreasonable for the state court to conclude Petitioner did not satisfy Strickland's prejudice prong. The record establishes that the testimony at issue provided no direct information to the jury as to whether the gangs were permitted to cooperate with each other in the commission of a homicide. At most, the exchange suggested the expert had asked members whether the gangs could cooperate in the commission of a homicide and left unanswered whether the members responded to the question and the nature of their responses, if any. Moreover, the court twice instructed the jury to disregard the question and answer and clarified that the expert had misunderstood the question and that the expert actually never asked any members if the gangs were allowed to cooperate in the commission of a homicide. The Fifth Appellate District's conclusion that Petitioner could not have been prejudiced by this exchange is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, the Court must defer to the state court's decision and Petitioner's ineffective assistance of counsel claim must be denied.

## V.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that:

1. The first claim for relief in the petition for writ of habeas corpus be DISMISSED;

2. The second and third claims for relief in the petition for writ of habeas corpus be DENIED; and

3. The Clerk of Court be directed to close the case.

23

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **December 30, 2015**          /s/ Erica P. Grosjean
                                        UNITED STATES MAGISTRATE JUDGE